UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TERI MOREHOUSE, as an individual, LORISA WELLOCK, as an individual, LISA MILLER, as an individual,<br><br>Plaintiffs,<br><br>v.<br><br>IDAHO STATE DEPARTMENT OF CORRECTIONS; and BRENT D. REINKE, individually and in his official capacity; TEREMA CARLIN, individually and in her official capacity; THOMAS HOUDESHELL, individually and in his official capacity; KENNETH ALLDRIN, individually and in his official capacity; ROBERT QUINN DAVIDSON, individually and in his official capacity; AARON KRIEGER, individually and in his official capacity; TERRI TOMISSER, individually and in her official capacity; THOMAS MCKINZIE, individually and in his official capacity,<br><br>Defendants. | Case No. 3:11-cv-00167-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

# INTRODUCTION

The Court has before it Defendants' Motion for Severance of Claims (Dkt. 26), and Defendants' Motion to Strike Portions of the Morehouse, Wellock, and Miller

Affidavits (Dkt. 28). The motions are fully briefed and at issue. For the reasons expressed below, the Court will DENY the Motion for Severance of Claims and will DENY as moot the Motion to Strike.

## BACKGROUND

Plaintiffs Teri Morehouse, Lisa Miller, and Lorisa Wellock filed a joint First Amended Complaint and Demand for a Jury Trial (Dkt. 13) against the Idaho State Department of Corrections (IDOC) and seven IDOC employees on September 16, 2011. *Am. Compl*. ¶¶ 1.1-1.13, Dkt. 13. Plaintiffs are former correctional facility workers at IDOC's Idaho Correctional Institution located in Orofino, Idaho (ICI-O) and at the North Idaho Correctional Institution, located in Cottonwood, Idaho (NICI). *Id*. ¶ 3.1, Dkt. 13.

### 1. Teri Morehouse

Plaintiff Morehouse began working as a correctional facility worker at the IDOC's ICI-O in April 2008. *Id*. at ¶ 3.3. Morehouse was assigned to report to training officer Thomas Houdeshell for her mandatory training, evaluation, and advancement. *Id*. at ¶ 3.5. Morehouse alleges that Houdeshell sexually harassed her during this training. *Id*. at ¶ 3.7. Houdeshell did not complete the mandatory training with Morehouse but suggested he could help with Morehouse's career advancement because he was friendly with Warden Terema Carlin. *Id*. at ¶¶ 3.7-3.10. In October 2008, Houdeshell denied Morehouse advancement to Peace Officer Standards Training (POST) by not signing her training logs. *Id*. at ¶ 3.15. Morehouse was told she could not advance without Houdeshell's written approval. *Id*. Houdeshell suggested meeting at a bar to discuss

Morehouse's training logs but she refused. *Id*. at ¶ 3.16. Morehouse notified Lieutenant Thomas McKinzie about Houdeshell's conduct. *Id*. at ¶ 3.17. Lieutenant McKinzie allegedly violated standard operating procedures (SOP) by failing to report the complaint to the Office of Professional Standards (OPS) or to Human Resource Services (HRS). Instead, he ordered Houdeshell to complete Morehouse's training logs. Houdeshell signed the training logs without conducting Morehouse's mandatory training. *Id*.

In February 2009, POST officers and Warden Carlin characterized Morehouse as being insufficiently tough for corrections work. *Id*. at ¶ 3.20. In response to this characterization, Morehouse complained to the POST administration, OPS, and to Warden Carlin that she was being mischaracterized because IDOC officials had been sexually inappropriate with her. *Id*. at ¶ 3.21. Warden Carlin revoked Morehouse's status, placed her on probation, and assigned her to be closely supervised. *Id*. at ¶ 3.23. Houdeshell continued to sexually harass Morehouse. *Id*. at ¶ 3.24. Morehouse again complained of the harassment to IDOC supervisors. *Id*. at ¶ 3.25.

In May 2009, IDOC assigned Houdeshell to train Morehouse in remedial combat, arrest, handcuff, and other hand-to-hand physical training. *Id*. at ¶ 3.27. Morehouse protested this assignment to her supervisors and Warden Carlin. Warden Carlin instructed Morehouse to file a report regarding her issues with Houdeshell and to not discuss the situation with anyone other than her supervisors and Warden Carlin. On May 29, 2009, Morehouse submitted an IDOC Information Report Form regarding Houdeshell's sexual harassment towards her. *Id*. at ¶¶ 3.28-3.30. On June 10, 2009,

Houdeshell received a Notification of Staff Investigation regarding his misconduct. Houdeshell continued to make contact with Morehouse during their night shifts and demanded shift-change status reports from Morehouse while physically blocking her exit. *Id*. at ¶ 3.34.

On June 17, 2009 Morehouse was interviewed by OPS personnel regarding her complaint. *Id*. at ¶ 3.35. Morehouse alleges OPS did not provide a safe environment to conduct the interview because she was escorted into the OPS interview while the swing and graveyard shifts passed through the main lobby of the prison, in plain view of many co-workers. Accordingly, fellow officers asked her about the interview. *Id*. at ¶¶ 3.36-3.38. OPS terminated its investigation in June 2009. *Id*. at ¶ 3.36.

On July 16, 2009, Warden Carlin terminated Morehouse for failing to complete her probation training and accused her of publicizing her OPS complaint. *Id*. at ¶ 3.42. On November 21, 2009, Morehouse filed a Notice of Claim with the United States Equal Employment Opportunity Commission ("EEOC") describing sex discrimination, quid pro quo, hostile work environment, and retaliatory dismissal. On January 20, 2011, Morehouse received a Notice of Right to File Suit from the EEOC. *Id*. at ¶¶ 3.44-3.45.

   2. **Lisa Miller**

Plaintiff Miller began working as a correctional officer at the IDOC's ICI-O in December 2008. *Id*. at ¶ 3.46. On June 18, 2009, she was interviewed by an OPS investigator regarding Morehouse's complaint against Houdeshell. *Id*. at ¶ 3.48. After her interview, Houdeshell approached her at home regarding her OPS interview. *Id*. at ¶

3.49. On July 28, 2009, Miller was contacted regarding a potential transfer to IDOC's NICI facility in Cottonwood, Idaho and in August 2009 she was transferred. *Id.* at ¶¶ 3.50-3.51.

At NICI, Miller's supervisors reported anonymous, unwritten inmate grievances against her for improper sexual boundaries and flirtation. *Id.* at ¶ 3.53. Miller also alleges she was often put in unsafe situations, where the ratio of inmates to corrections officers was overwhelming and exceeded standards. *Id.* at ¶ 3.54. Miller further alleges that despite written evaluations asserting her effectiveness at managing inmates, Deputy Warden Aaron Krieger told her that she was a weak link, crediting anonymous, unspecified, and unwritten grievances by inmates stating Miller lured inmates into unlawful romantic entanglements. *Id.* at ¶ 3.58. Warden Krieger stated that the next grievance would be her last and advised her to look for other work. *Id.* On May 26, 2010, Miller resigned from employment at IDOC NICI for health reasons based on her physician's suggestion. *Id.* at ¶ 3.59.

Miller filed harassment, discrimination, and retaliation complaints with OPS. *Id.* at ¶ 3.60. She alleges that OPS violated their standard operating procedures ("SOP") by not recording her complaints or the investigation and by not making formal or informal findings. *Id.* at ¶ 3.61. On February 10, 2011, Miller delivered an executed Notice of Claim to the EEOC describing sexual harassment and retaliation. *Id.* at ¶ 3.62. On July 28, 2011, Miller requested a right to sue letter from the EEOC. *Id.* at ¶ 3.63. Her claim is still pending. *Id.*

### 3. Lorisa Wellock

Plaintiff Wellock began working as a food service officer at the IDOC's NICI in November 2006. *Id*. at ¶ 3.64. In July 2007 she made a complaint against a female co-worker. According to Wellock, as a result of her complaint, her supervisor Robert Quinn Davison retaliated against her. The alleged retaliation included excessive and baseless criticism of her job performance, publicizing embarrassing details of her being sexually propositioned at work (at issue in her complaint), placing her in at-risk work assignments where she was alone behind locked doors with up to four violent inmates, denying her training benefits, and causing IDOC to falsely certify that her training was complete. *Id*. at ¶ 3.66.

In October 2008 Wellock filed an EEOC complaint and an internal "Problem Solving Request Form" against her supervisor, Davidson. *Id*. at ¶¶ 3.68- 3.69. She claims that her complaints were not taken seriously and instead she was falsely accused of misconduct – having unlawful sexual relations with inmates. *Id*. at ¶¶ 3.70, 3.71.

From February to April 2009, Wellock was placed on medical leave and doctor-approved light duty work due to pain in her neck, right shoulder, and arm. *Id*. at ¶¶ 3.72-3.75. During this period, Warden Carlin allegedly rescinded Wellock's approval for light duty work and sent her home for 50 days without pay. *Id*. at ¶ 3.76. On April 29, 2009, Wellock received a letter stating that IDOC was considering a medical layoff because she had exhausted her 84 days of Family and Medical Leave Act (FMLA) leave, and on May 21, she was laid off. *Id*. at ¶¶ 3.77- 3.78. The paperwork she received when she was laid

off indicated that she had one year to place herself on IDOC's register to be rehired, and for a period of one year, "the Department must re-employ [Wellock] before filling the vacancy in [her] classification through other means." *Id*. at ¶ 3.78. On July 22, 2009, Wellock was medically cleared to return to work with no restrictions. *Id*. at ¶ 3.79. Between August 2009 and April 2010 Wellock applied for approximately five IDOC food service job openings but was not hired for any of them. *Id*. at ¶¶ 3.79-3.83. Wellock alleges that IDOC violated its recall policy by hiring persons who were not on the Department rehire list. *Id*. at ¶ 3.85.

## LEGAL STANDARD

Federal Rule of Civil Procedure 20 provides that persons may join in one action as plaintiffs if:

> (A)  they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
> (B)  any question of law or fact common to all plaintiffs will arise in the action.

Fed. R. Civ. P. 20(a)(1)(A)-(B). The permissive joinder rule "is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits." *League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977). The purpose of Rule 20(a) is to address the "broadest possible scope of action consistent with fairness to the parties;

joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of Am. V. Gibbs*, 383 U.S. 715, 724 (1966).

For there to be transactional relatedness under Rule 20(a)(1)(A), the claim must arise out of the same transaction, occurrence, or series of transactions or occurrences. Fed. R. Civ. P. 20(a)(1)(A). There is no bright-line definitions of "transaction," "occurrence," or "series," and courts assess the facts of each case individually to determine whether joinder is sensible in light of the underlying policies of permissive party joinder. *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997). Although the case may involve different occurrences, where the claims involve enough related operative facts, joinder in a single case may be appropriate. *Id*.

The second part of the joinder test requires commonality. Commonality under Rule 20(a)(1)(B) is not a particularly stringent test. *Bridgeport Music, Inc. v. 11C Music*, 202 F.R.D. 229, 231 (M.D. Tenn. 2001) ("the common question test [ ] is usually easy to satisfy"). The common question may be one of fact or of law and need not be the most important or predominant issue in the litigation. *See Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974) (Rule 20(a) does not establish a quantitative or qualitative test for commonality).

Federal Rule of Civil Procedure 21 provides that "[m]isjoinder of parties is not a ground for dismissing an action. On motion or on its own motion, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21. Thus, if the test for permissible joinder is not satisfied, a

court, in its discretion, may sever the misjoined parties, so long as no substantial right will be prejudiced by severance. *Coughlin*, 130 F.3d at 1350.

## ANALYSIS

**1.     Severance of Claims**

The Court begins its analysis with the premise that Rule 20 serves to "promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits." *League to Save Lake Tahoe*, 558 F.2d at 917. Based upon Plaintiffs' complaint, there are common occurrences or series of occurrences as well as common questions of law and fact to deny severance of claims at this point in the litigation.

**A.     Same transaction or occurrence**

The Ninth Circuit defines the terms "transaction or occurrence," in Rule 20(a)(1)(A), to mean "similarity in the factual background of a claim." *Bautista v. Los Angeles County*, 216 F.3d 837, 842-43 (9th Cir. 2000). Claims that "'arise out of a systematic pattern of events' arise from the same transaction or occurrence." *Id*.

Courts have found that employees who have been discriminated against under a continuing pattern and practice have claims arising out of the same transaction or occurrence. *See Puricelli v. CNA Ins. Co.*, 185 F.R.D. 139 (N.D.N.Y. 1999) (former employees who brought age-discrimination suit against the same employer satisfied the "same transaction or occurrence" prong of the permissive-joinder rule, when they alleged a pattern of conduct, which discriminated against them on the basis of age); *see also Mosely*, 497 F.2d 1330 (same transaction or occurrence prong satisfied where claim by

ten plaintiffs for a racially discriminatory workplace alleged injury by a company-wide policy designed to discriminate against African-Americans).

Furthermore, distinctive treatment of each plaintiff does not indicate that the claims are outside the scope of the "same transaction and occurrence." *Mosley*, 497 F.2d at 1333-34 (joinder proper where discriminatory nature of defendant's act was basic to all plaintiffs even though each may have suffered different effects from the alleged discrimination); *see also Kohn v. American Housing Foundation I, Inc.*, 170 F.R.D. 474 (D. Colo. 1996) (joinder appropriate in action alleging breach of Medicare contracts, negligence, and violations of the Colorado Consumer Protection Act although there might have been distinctive treatment of each plaintiff).

Here, Plaintiffs all point to one agency-wide policy under which they allegedly suffered discrimination. *Pl.'s Resp.* at 13, Dkt. 27. Plaintiffs allege a common practice through a series of harassment based on their gender, with the underlying concept that they were unable to perform their job requirements. *Id*. Plaintiffs further allege that they shared the same abuses of gender stereotyping and sexual harassment, were all retaliated against, and had their complaints mishandled by the IDOC. *Id.* at 16. Specifically, Plaintiffs allege five patterns of conduct that they all suffered while working for the IDOC to constitute their cause of action: (1) All Plaintiffs experienced sexual harassment; (2) IDOC had knowledge of the sexual harassment; (3) the complaints were not handled in accordance with IDOC policy; (4) the Plaintiffs were retaliated against after complaining or participating in sexual harassment investigations; and (5) all

Plaintiffs were the object of sex appeal or accusations of sex appeal. *Pl.'s Resp.* at 2-12, Dkt. 27.

While Defendants focus on the factual differences among the Plaintiffs' claims, they fail to recognize the common allegation of IDOC's policy of discrimination which affected the Plaintiffs. *Def.'s Br.* at 6-8, Dkt. 26-1. Accordingly, Plaintiffs satisfy the same transaction or occurrence prong.

### B.     Common Question

The second prong of the joinder rule requires only that there be some common question of law or fact as to all the of the plaintiffs' claims, not that all legal and factual issues be common to all plaintiffs. *Mosley*, 497 F.2d at 1333. Accordingly, when multiple plaintiffs bring suit for employment discrimination alleging a pattern of discriminatory behavior, a broad variation of circumstances relating to the merits of individual performance of each of the plaintiffs will not nullify a common question of fact. *Disparate v. Corporate Executive Bd.*, 224 F.R.D 1, 7 (D.D.C. 2004); *see also Mosley*, 497 F.2d 1330 (common question of law or fact found where alleged discriminatory character was basic to the plaintiffs, even though the individual members may have suffered different effects).

Defendants argue that because Plaintiffs' claims arose from separate transactions at more than one facility, they do not share a common question of law or fact. *See Def.'s Br.* at 6-9, Dkt. 26-1. There are, however, common questions of law and fact among the Plaintiffs' claims. First, each Plaintiff filed claims alleging sex discrimination and

retaliation for filing the claim. *Pl.'s Resp*. at 17, Dkt. 27; *Am. Compl.*, ¶ 7.4, Dkt. 13. Likewise, the Plaintiffs all worked for the same entity experiencing similar circumstances and treatment. *Id*. Finally, each Plaintiff alleges a § 1983 claim for deprivation of constitutional rights under color of law and breach of contract based on their experience working for IDOC. *Am. Compl*. ¶¶ 7.1- 8.5, Dkt. 13. These factual and legal commonalities all satisfy the second prong.

While the Plaintiffs do not share in every claim, principles of trial convenience and necessity weigh in favor of denying the motion to sever at this stage of the litigation. Separate trials could be conducted as to those issues or claims not common among all the Defendants or Plaintiffs. *See Vulcan Soc. of Westchester County v. Fire Dept. of City of White Plains*, 82 F.R.D. 379 (S.D.N.Y 1979). However, separation of those issues would be at the expense of judicial economy.

**2.      Motion to Strike**

Defendants' Motion to Strike Portions of Plaintiffs' Affidavits (Dkt. 28) is moot as the affidavits (Dkts. 27-1, 27-2, & 27-3) were not material in the Court's reasoning to deny the motion to sever claims.

For all of the reasons stated above, Plaintiffs satisfy the liberal standards for joinder of claims and Defendants will not suffer unnecessary delay, expense, or prejudice at this early stage of litigation. Similarly, this Court evaluates judicial economy and the administrative burdens of managing such cases in denying Defendants' motion at this

stage of the litigation. The Court may, however, entertain an additional motion to sever as this case nears trial.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion for Severance of Claims (Dkt. 26) is **DENIED**.

2. Defendants' Motion to Strike Portions of the Morehouse, Wellock, and Miller Affidavits (Dkt. 28) is **DENIED AS MOOT**.

DATED: April 23, 2012

B. Lynn Winmill
Chief Judge
United States District Court