UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TERI MOREHOUSE, as an individual, LORISA WELLOCK, as an individual LISA MILLER, as an individual,<br><br>Plaintiffs,<br><br>v.<br><br>IDAHO STATE DEPARTMENT OF CORRECTIONS; BRENT D. REINKE, individually and in his official capacity; TEREMA CARLIN, individually and in her official capacity; THOMAS HOUDESHELL, individually and in his official capacity; ROBERT QUINN DAVIDSON, individually and in his official capacity; AARON KRIEGER, individually and in his official capacity; THOMAS MCKINZIE, individually and in his official capacity;<br><br>Defendants. | Case No. 3:11-CV-00167-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it (1) a motion filed by the defendants for summary judgment on all claims and (2) a motion filed by plaintiff Wellock for partial summary judgment on her breach of contract claim. The Court heard oral argument on July 29, 2013, and the motions are at issue.

# ANALYSIS

The three plaintiffs – Morehouse, Wellock, and Miller – were employed at the Idaho Department of Corrections (IDOC).  They have sued IDOC and several of its employees, complaining that during their employment with IDOC they were harassed, discriminated against, and denied their constitutional rights.

The three plaintiffs have separate claims, although they overlap to some degree. Plaintiffs Morehouse and Miller have brought Title VII claims that comprise Count One (gender discrimination) and Count Three (retaliation for engaging in protected activity). Morehouse has brought a third Title VII claim in Count Two for quid pro quo sexual harassment; no other plaintiff has joined Count Two.  The final two Counts – Counts Four and Five – are brought by all three plaintiffs.  They allege that the defendants violated § 1983 (Count Four) and breached a contract (Count Five).

The claims of each plaintiff are largely unique, although there are some principles common to all the claims.  The Court will begin by evaluating the claims of plaintiff Morehouse, specifically her claims under Title VII.  The Court will then examine plaintiff Miller's claims under Title VII.  Finally, the Court will evaluate the joint claims of each plaintiff under § 1983 and for breach of contract.

## Title VII – Hostile Work Environment – Plaintiff Morehouse

Plaintiff Morehouse claims that IDOC and individual IDOC employees violated her Title VII rights by subjecting her to a hostile work environment and then ultimately firing her in retaliation for reporting that harassment.  IDOC seeks summary judgment,

arguing that Morehouse "admits she experienced a single incident of unwelcome conduct which is most aptly described as improper conduct rather than sexual harassment." *See IDOC Reply Brief (Dkt. No. 89)* at p. 2.

The Court disagrees. Morehouse has alleged a serious and continuing course of sexual harassment that at least creates questions of fact on this claim. For example, Morehouse alleges that just three weeks after she began work at IDOC, her Field Training Officer, Tom Houdeshell, "put his hand to my crotch" and when she resisted, he "argued for more, telling me he could 'help me get my job . . . .'" *See Morehouse Affidavit (Dkt. No. 79-1)* at ¶ 2. When Morehouse countered that she already had a job, Houdeshell responded that "remains to be seen, you're on probation and I'm your FTO [Field Training Officer]." *Id.* Shortly after that incident, Morehouse alleges that Houdeshell

> held me down in my chair with one hand on my shoulder. With the other he groped me, with only my clothing separating his hand from my breast. Then he pressed his body against my side and rode it up and down and up and down and up and down. I could not get him off me. I yelled and struggled. It felt like forever. He did not stop until I found the wall with my feet and kicked the chair backwards to roll it over him and knocked him nearly off his feet. I screamed at him and threatened him and told him not to touch me or stare at my breasts or talk about his private life or mine. I remember him looking at me coolly and he said 'like I say, you are on probation.'

*Id.* The alleged harassment continued as Houdeshell (1) refused to complete a Progress Report on Morehouse "unless I [Morehouse] met him at a bar after work," (2) signed e-mails "Love Tom," and (3) "put his arm on my shoulder . . . until I slapped him off me as we talked about written materials I needed for my probation review." *Id.* at ¶¶ 3, 6.

When IDOC assigned Houdeshell to be Morehouse's trainer for her POST certification training, Houdeshell would attend training exercises to "stare at and mock" Morehouse. *Id*. at ¶ 6.  She describes another incident where Houdeshell "found me alone on duty" and "closed the gap between us and grabbed me by both arms and said 'what did you tell them about me?'"  *Id*.   When Morehouse pushed him away, "he grabbed my arms again, but I got around him out the door.  He laughed at me."  *Id.*

While IDOC argues that Morehouse is not credible, this Court must assume that her allegations are true in this summary judgment proceeding.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  To survive summary judgment on her hostile work environment claim, Morehouse must raise genuine issues of material fact that (1) she was subjected to verbal or physical harassment due to her gender, (2) the harassment was unwelcome, and (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.  *See Kortan v. California Youth Authority*, 217 F.3d 1104, 1110 (9th Cir. 2000).

On each of these three points, Morehouse has raised genuine issues of material fact.  Her allegations, if believed, show that she was subjected to severe and pervasive sexual harassment that created an abusive work environment.  The harassment could be viewed as both objectively and subjectively offensive:  A reasonable person would find the work environment to be "hostile or abusive," and Morehouse herself did perceive it to be so.  *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998).

IDOC argues, however, that Morehouse reported only a mild account of the harassment that failed to put IDOC on notice that it was so severe and pervasive.  When a

supervisor engages in harassing conduct, and a tangible employment action is taken against the harassed employee, the employer is held "strictly liable" without inquiry into whether the harassed employee reported the harassment. *Vance v. Ball State University,* 133 S.Ct. 2434 (2013). A "supervisor" is defined as an employee who has authority to "effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2443. Where the harassment is conducted by a co-worker rather than a supervisor, the employer may be liable if it knows or should know of the harassment but fails to take steps "reasonably calculated to end the harassment." *Dawson v. Entek Intern.*, 630 F.3d 928, 937-38 (9th Cir. 2011).

Here, there are at least questions of fact concerning Houdeshell's supervisory role over Morehouse. He was her Field Training Officer, and his Progress Reports on Morehouse would be used to determine whether she could advance beyond probationary status. *See Reinke Deposition (Dkt. No. 79-2)* at p. 46. According to Morehouse, Houdeshell used his apparent authority over her probationary status as leverage in his attempt to obtain sexual favors. If Houdeshell is found to be a supervisor, IDOC could be strictly liable for his conduct under *Vance* because Morehouse suffered a "tangible employment action" – she was fired, allegedly in retaliation for reporting the harassment.

However, even if Houdeshell is a mere co-worker rather than a supervisor, and IDOC is entitled to notice, there are questions of fact over whether Morehouse gave that notice. Morehouse alleges that she reported the harassment to four different IDOC management officials: Brisbin, Welch, Lynch and Carlin. *See Morehouse Affidavit,*

*supra* at ¶ 3.  She asserts that she was ignored by all four.  *Id.*  She reported the incidents to Brisbin twice.  The second report was transcribed, and Morehouse describes the second incident where Houdeshell has "got his arm around my shoulder with his hands almost touching my breast."  *See Transcript (Dkt. No. 79-1).*  And then she says that "his body's pushing against my side[1]" and she told him "to get the hell away from me, you don't do that to me."  *Id.*  During the brief few moments that Morehouse is describing this incident to Brisbin, the transcript notes at six different points that Morehouse is either "starting to cry" or is "crying."  Brisbin asks no follow-up questions  to determine why Morehouse is so emotional.[2]

This account is not as detailed as the account Morehouse gives in her affidavit discussed above.  Yet the intense emotion Morehouse displayed in her interview with Brisbin could lead a reasonable juror to conclude that Brisbin should have suspected that Morehouse was subjected to something more severe than an incidental shoulder touch and side bump.  A juror could conclude that Brisbin should have asked more questions to explore the source of that intense emotion, and that Brisbin failed to do so because she was ignoring Morehouse.

Thus, this single account in June of 2009 raises genuine issues of material fact over whether IDOC received sufficient notice.  More questions are raised by the other reports that Morehouse made to IDOC management officials Carlin, Welch, and Lynch,

---

[1] The transcriber used the word "thighs" but Morehouse asserts that she actually said "side." *See Morehouse Affidavit (Dkt. No. 79-1)* at pg. 4, n.1.

[2] Morehouse also made a report to Brisbin a few months earlier, in March of 2009.  In that earlier report, Morehouse states that she reported "much the same thing" as her later report.  *See Morehouse Deposition (Dkt. No. 79-1)* at p. 215.

and an earlier report she made in March 2009 to Brisbin.  These questions preclude a finding that IDOC had insufficient notice as a matter of law.

IDOC argues that the Title VII claim is barred by the statute of limitations.  But this argument relies entirely on a faulty assumption that the Title VII claim is based on a single incident of harassment in April of 2008.  As discussed above, the harassment continued throughout her employment.  The continuing nature of the harassment allows Morehouse to sweep all the acts into her Title VII claim because the acts "collectively constitute one unlawful employment practice" for purposes of Title VII's limitations period.  *Nat'l R.R. Passenger Co. v. Morgan*, 536 U.S. 101, 116 (2002).  As long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Id.*  Because some of the alleged harassment occurred within the limitations period, the Court rejects IDOC's argument that the Title VII claim is barred by the statute of limitations.

**Title VII – Quid Pro Quo – Morehouse**

Morehouse claims that Houdeshell's acts constituted quid pro quo discrimination because he conditioned employment benefits on sexual favors.  As discussed above, there are at least questions of fact over whether Houdeshell used his authority as FTO as leverage to obtain sexual favors from Morehouse.  This precludes summary judgment on the quid pro quo claim

**Title VII – Retaliation – Morehouse**

Morehouse claims that she was fired in retaliation for reporting sexual harassment. She has clearly made out a prima facie case, as the discussion above demonstrates. *Vasquez v. County of Los Angeles,* 349 F.3d 634 (9th Cir. 2003). The burden now shifts to the IDOC to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. *Id*. at 639.

Morehouse was fired by the IDOC Warden, Terema Carlin. Carlin states that Morehouse was fired for leaking details about a confidential investigation and for failing to pass her POST certification. *See Carlin Affidavit (Dkt. No. 58-6) at ¶ 4.* IDOC argues that these are legitimate nondiscriminatory reasons for the firing, and that they compel the dismissal of Morehouse's Title VII retaliation claim.

When an employer asserts legitimate reasons for an alleged discriminatory firing, the plaintiff must raise a genuine issue of fact as to whether those reasons are pretextual to avoid summary judgment. *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1062–64 (9th Cir.2002). Morehouse has done so here.

With regard to IDOC's assertion that Morehouse leaked confidential material, Carlin relied on a report containing that allegation. *See Information Report (Dkt. No. 81-1).* The original report was prepared by Timothy Owens, a Corrections Officer with IDOC in 2009. *See Owens Affidavit (Dkt. No. 81-1) at ¶ 3.* It contains a brief discussion that ends with a phrase, "End of Report." That discussion says nothing about Morehouse leaking information. But after the phrase "End of Report" is an additional typewritten sentence alleging that Morehouse leaked details of a confidential investigation, the allegation that Warden Carlin relied upon in firing Morehouse.

The additional typewritten sentence immediately draws suspicion because it appears to have been added after the author ended the report.  The author, Officer Owens, states that the words in the additional sentence (that Morehouse leaked information) "are not my words and I was given no information about an investigation."  *See Owens Affidavit, supra* at ¶ 9.  The placement of the words after the phrase "End of Report" would cause a reasonable person to investigate by contacting the author.  If Warden Carlin had done that, he would have discovered that those were not Owens' words.  Warden Carlin's failure to investigate this allegation, when its weakness was apparent on the face of the document, is some evidence of pretext.

There is further evidence of pretext in Carlin's statement that even if she ignored the allegations that Morehouse leaked confidential information, she would have still fired Morehouse for failing to obtain her POST certification.  *See Carlin Affidavit (Dkt. No. 58-6)* at ¶ 4.  If Morehouse is to be believed – and the Court must do so in this summary judgment proceeding – IDOC appointed Houdeshell to be her POST certification trainer *after* she had reported his sexual abuse to IDOC.  There is at least a question of fact over whether this appointment ensured Morehouse's failure.

Moreover, before Morehouse was terminated, she reported to Brisbin her medical ailments of sleeplessness, uncontrolled shaking, uncontrolled  crying and PTSD, and Brisbin passed this on to Warden Carlin.  It is undisputed that POST provides for extensions of time for those suffering such illness.  Nevertheless, four days after learning of Morehouse's ailments, Warden Carlin fired Morehouse for not passing the POST certifications.

If Morehouse is to be believed, IDOC had ample reason to believe that her medical ailments were the result of sexual harassment and that she needed additional time to complete the POST certifications.  Indeed, the POST Council, although ignorant of her past harassment and subsequent medical ailments, later ruled (without knowing that she had been fired) that she was entitled to an extension.  Warden Carlin knew so much more that justified an extension and yet was in such a hurry to fire her.  Under these circumstances, a reasonable juror could find that Warden Carlin's stated reason for the firing (that Morehouse failed to pass her POST certification) was a pretext for the real reason, which was that she reported sexual harassment.

Thus, there are questions whether both reasons given by Warden Carlin for the firing were pretextual.  The Court will accordingly deny the motion for summary judgment on the Title VII retaliation claim.

## Title VII Claims – Plaintiff Lisa Miller

Plaintiff Lisa Miller was hired in 2008 by IDOC as a Corrections Officer.  She roomed with plaintiff Morehouse at the POST Academy training in January of 2009.  Miller claims that she was subjected to disciplinary action and a transfer after participating in the investigation of Houdeshell's harassment of Morehouse.  Following the transfer, she received many false complaints from inmates, she alleges, that caused her to suffer from stress-related health problems that eventually forcing her to resign in 2010.

In the summer of 2009, IDOC's Ken Alldrin told Miller that she was "well liked" and that if she "wanted to keep it that way, [she] would stop talking to Teri Morehouse."

*See Miller Deposition (Dkt. No. 83-1)* at p. 221.  This warning from Alldrin came after Morehouse had reported Houdeshell's harassment in March of 2009.  *See Morehouse Deposition (Dkt. No. 79-1) at p. 215.*

After Miller had been warned by Alldrin not to talk to Morehouse, Miller was called into an interview to discuss Morehouse's allegations of harassment against Houdeshell.  *See Miller Deposition, supra* at 236 (pointing out that interview was after Alldrin's warning).  The interview was conducted by Lori Brisbin, an investigator in the Office of Professional Standards (OPS) for IDOC.  *See Miller Affidavit (Dkt. No. 27)* at ¶ 4.

In the interview, Miller repeated what Morehouse had told her about Houdeshell but disavowed those criticisms and stated that he had not acted that way toward her.  For example, Miller told Brisbin that Morehouse had said that Houdeshell was "hitting on her (Morehouse) several times," but that Houdeshell had never tried to hit on her (Miller), and that "people are tired of listening to Morehouse complain."  *See Report (Dkt. No. 83-1).*  Miller also told Brisbin that Morehouse had said Houdeshell was a "terrible FTO" who "did not follow up on any of the paperwork" and did not spend "enough time with her (Morehouse) to complete the FTO tasks."  *Id.*   Miller recounted a meeting she attended conducted by Morehouse that discussed filing a lawsuit against IDOC, but Miller told Brisbin that she was not invited back because they realized she "was not in support of their efforts to sue IDOC."  *Id.*

After the interview, Houdeshell parked behind Miller at her house and confronted her, demanding to know what she had told the investigator.  *See Miller Affidavit, supra* at

¶ 4.  Miller reported this to Brisbin, and Houdeshell was later reprimanded by Warden Carlin for breaching confidential investigation protocols.

In July of 2009, after the interview with the investigator, Miller's request to transfer to the North Idaho Correctional Institute (NICI) was granted.  But upon arriving there, she was accused of acting inappropriately with inmates, being flirtatious, and wanting sexual relations with the inmates.  In her Performance Evaluation issued in December of 2009, IDOC notes that it investigated these complaints and concluded that "these allegations were found to be false."  *See Performance Evaluation (Dkt. No. 83-1)* at pg. 33.   At least two of the inmates who had written complaints admitted they had lied to cause trouble for Miller.  *See Miller Affidavit, supra* at ¶ 7.  Despite the proven falsity of these complaints, they nevertheless were mentioned in Miller's Performance Evaluation, a document crucial to her ability to move out of probationary status.

Although the complaints were false, Miller was assigned to a class for those with "boundary" issues.  She was directed to carry around a tape recorder to record her communications with inmates to improve her interaction skills.  This caused such tension with the inmates that Miller requested a transfer to another Unit on night shift.  She was told by her mentor that anyone asking for a transfer to a night shift "is obviously having intimate relations with inmates and is looking for more private time."  *Id*. at ¶ 10.

In the Spring of 2010, Deputy Warden Aaron Krieger called her into his office and said that "he had seen reports quoting inmates that I was flirting again."  *Id*. at ¶ 12. When she demanded to see the grievances, Deputy Warden Krieger "screamed at me that

I would do as I was told." *Id*. at ¶ 14.  He told Miller that the next inmate complaint he got would end her career.  *See Miller Deposition, supra* at p. 207.

The record shows that a number of inmate complaints about Miller were placed in her personnel file.  *See Exhibit 101 (Dkt. No. 84 ) & Smith Affidavit (Dkt. No. 79)* at ¶ 106.  Many of the complaints were that she was acting in sexually provocative ways or was having sex with inmates.  *Id.*  Other female correctional officers were subject to the same type of complaints from inmates.  *See Exhibit 66 (Dkt. No. 82)*(cataloging inmate complaints that IDOC Food Service Officer Wellock was having sexual relations with inmates and acting in sexually provocative ways); *Exhibit 34 (Dkt. No. 80-1)*(cataloging inmate complaints that IDOC employee Barbara Onley was having sexual relations with inmates).

Miller quit in May of 2010.  At that time she was suffering from irritable bowel syndrome (IBS) and asthma.  She had experienced some increases in abdominal pain associated with IBS that she alleges were a reaction to the high level of stress she felt working at NICI.  The day she decided to quit, Miller had another argument with Kreiger about an anonymous inmate complaint that she had conducted herself inappropriately. *See Miller Deposition (Dkt. No. 59-3)* at p. 209.  Miller decided it was not worth it to continuing working at NICI  considering the IBS symptoms she was having in reaction to the stress of these disagreements.  *Id.*  Miller and her doctor agreed that she need to quit her job at NICI "in order to maintain her health." *Id.*

**Title VII Gender Discrimination – Plaintiff Miller**

IDOC argues that Miller has failed to present any evidence to support her claim of gender discrimination under Title VII.  The Court disagrees.  Miller has presented evidence that at least raises a question of fact as to whether IDOC relied on false charges that she was acting out sexually[3] to take adverse actions against her.  The false charges were gender specific – that is, they charged her with acting in sexually provocative ways toward the male inmates.  In essence, the false charges were based on a sexual stereotype and relied upon by IDOC.

Such sexual stereotyping is prohibited by Title VII.  *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250-51 (1989).  The plaintiff in an employment discrimination action "need produce very little evidence in order to overcome an employer's motion for summary judgment."  *Chuang v. Univ. of Calif. at Davis, Bd. Of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000).  This is because "the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record."  *Id.*  Miller has produced evidence that raises a genuine issue of material fact that she was subjected to gender discrimination.

**Title VII Retaliation Claim – Plaintiff Miller**

IDOC seeks summary judgment on Miller's retaliation claim, arguing that she voluntarily quit and was not subjected to any adverse employment action.  To establish a prima facie retaliation claim under Title VII, an employee "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

---

[3] By this term "acting out sexually" the Court is referring to the discussion above of false claims that Miller engaged in sexual relations with inmates and staff, and acted in sexually provocative ways around the inmates.

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013).  An "adverse

employment action" is defined as an action "reasonably likely to deter employees from

engaging in protected activity."  *Vasquez v. County of Los Angeles*, 349 F.3d 634, 646

(9th Cir. 2003).  It includes "any adverse treatment that is based on a retaliatory motive

and is reasonably likely to deter the charging party or others from engaging in protected

activity."  *Id.*

Placing false charges of sexual activity in Miller's personnel file and then taking

corrective action based on those false charges at least raises a question of fact over

whether IDOC subjected Miller to an adverse employment action.  This is especially true

given that one of the corrective actions was having Miller record all her communications

with inmates in a manner that was visible to the inmates.  In the prison world, where the

snitch is the lowest of life forms, this corrective action was degrading and potentially

even dangerous to Miller.  Indeed, Miller was so stressed by IDOC's actions that her

health problems forced her to resign, according to her allegations.

There are also questions of fact regarding causation.  The rash of false charges

were filed very shortly after she testified about Houdeshell in the interview with Brisbin.

Houdeshell's intimidating questioning of Miller – demanding to know what she had told

Brisbin – demonstrated that he had inside knowledge of what was supposed to be a

confidential process.  This indicates that Houdeshell may have been a driving force in the

retaliatory false charges.  This is some evidence that Miller was the victim of retaliation

for her testimony against Houdeshell.

Finding that Miller has raised genuine issues of material fact, the Court denies summary judgment on the retaliation claim under Title VII.

**Plaintiff Lorisa Wellock**

IDOC hired Wellock to work as a Food Service Officer at the Correctional Institute of Idaho - Orofino in November of 2006. *See Investigative Report (Dkt. No. 82)* at p. 3. In July of 2007, Wellock reported to the Warden that a female co-worker had been sexually harassing her. *See Exhibit 61 (Dkt. No. 81-1).* The next day, "the entire institution knew" about her confidential charge of harassment and "[i]t was very embarrassing." *Id* Her supervisor, defendant Robert Davidson, yelled at her that she should have reported this to him rather than to the Warden, even though the official policy directed reporting to anyone. From that point forward, Davidson berated her constantly and gave her poor performance evaluations. *Id.* Wellock maintains that Davidson harassed and demeaned her, publicized the details of the complaint and placed her in situations with inmates in which she feared for her safety. *Id.*

Wellock's internal complaints against Davidson resulted in no action, and so she filed an EEOC complaint. Davidson was upset about this and, according to Wellock, started a campaign among inmates to file false charges against Wellock. Inmates began to charge Wellock with having sex with other inmates. *Id.* There is evidence that Davidson solicited charges against Wellock from inmates Capcha and Johnson. *See Exhibit 66 (Dkt. No.82 ).* Both inmates filed charges that Wellock acted in sexually provocative ways and had sex with inmates. In January of 2009, managers at the Orofino Correctional Institution reported that they had received grievances accusing Wellock of

engaging "in a pattern of behavior that includes inappropriate communication with offenders and that she has developed an inappropriate relationship with Offender Wayne Metzger." Dkt.82 p. 1. The Office of Professional Standards conducted an investigation of the allegations and concluded that they were "false and unfounded." Complaint Dkt. 13 ¶ 3.71.

On February 20, 2009, Wellock sought medical treatment for pain she was experiencing in her neck, right shoulder, and arm.  Wellock's doctor and Warden Carlin authorized Wellock to return to work with light duty limitations on February 23, 2009. But three days later on February 26, 2009, Warden Carlin retracted Wellock's light duty work clearance and gave her fifty days of leave without pay.

On May 21, 2009, IDOC sent Wellock a letter stating that it was necessary to vacate her position based on the fact that she had "been off work due to disability since 02/26/2009."  The letter also informed Wellock that she had one year to place herself on the Department of Corrections rehire registry.  Wellock was placed on that registry and jobs in her classification came open over the next year.  IDOC hired six individuals for those jobs yet never once made an offer to Wellock.

Wellock has not filed a Title VII claim as did Morehouse and Miller.  Her claims are contained – along with those of Morehouse and Miller – in Count Four (the § 1983 claim) and Count Five (the breach of contract claim).

IDOC and the other defendants argue that Counts Four and Five should be dismissed against all three defendants for various reasons.  The Court will analyze those arguments before turning to the arguments addressing each individual plaintiff.

**Eleventh Amendment Immunity**

IDOC argues that the Eleventh Amendment requires dismissal of certain portions of the Fourth and Fifth Claims.  There is no dispute that to the extent that the Fourth and Fifth Claims could be read to seek compensatory damages against IDOC and the individual defendants sued in their official capacities, those allegations must be dismissed.

This will not result in a dismissal of the Fourth and Fifth Claims, because both contain allegations in addition to those just dismissed.  For example, the Fifth Claim – alleging that defendants breached a contract with plaintiffs – seeks the equitable remedy of reinstatement.  The Fourth Claim seeks back pay under § 1983 against the individual defendants in their individual capacity.  There is no dispute that those claims are not affected by the Eleventh Amendment.

**Breach of Contract Claims**

All three plaintiffs allege that IDOC breached its employment contract with the plaintiffs by failing to follow the Standard Operating Procedures (SOPs) applicable to its correctional facilities.  The plaintiffs allege that IDOC breached various SOPs by, among other things, (1) failing to assure that civil rights complaints were addressed in accordance with the SOPs; (2) failing to report all complaints to the Human Resources Department; and (3) failing to require all new staff to complete 120 hours of on-the-job training by institute staff.

IDOC seeks summary judgment on this claim, arguing that the SOPs cannot, as a matter of law, form the basis for a breach of contract.  IDOC cites in support the case of

*Service Employees Int'l Union Local 6 v. Idaho Dept. of Health and Welfare*, 683 P.2d

404 (Id.Sup.Ct. 1984), along with two other cases that reaffirm the holding in *Service*

*Employees.*

However, none of these cases involve a claim for breach of contract.  And none of

them discuss, much less purport to overrule, *Harkness v. City of Burley,* 715 P.2d 1283,

1286 (Id.Sup.Ct. 1986) holding, in a case involving a public employee, that "an

employee's handbook can constitute an element of the contract."  *Id*

Because *Harkness* remains good law, the Court must deny this aspect of IDOC's

summary judgment motion.

## The Three Plaintiffs' Claims Under § 1983

IDOC argues that with respect to each individual plaintiff, each has failed to

produce evidence of a § 1983 violation.  To prevail under § 1983 claim, the plaintiff must

prove that "(1) the conduct complained of was committed by a person acting under color

of state law; and (2) the conduct deprived the plaintiff of a constitutional right."  *L.W. v.*

*Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992).  Each plaintiff argues that the defendants

violated their First Amendment right to complain about sexual harassment by taking

adverse employment actions against each plaintiff.  Each plaintiff also alleges that the

defendants violated their "Fourteenth Amendment Substantive Due Process right to" (1)

employment, (2) gender-equality, (3) bodily integrity, and (4) liberty interest in their

reputation.  *See Amended Complaint (Dkt. No. 13)* at ¶ 7.4.  The Court will consider each.

## § 1983 – Denial of Employment

Because the government as employer has broader powers than the government as regulator, the scope of judicial review is correspondingly restricted. *Engquist v. Oregon*, 478 F.3d 985, 994 (9th Cir. 2007). Accordingly, "the Supreme Court has warned that '[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies,' and therefore the Constitution cannot be interpreted to require judicial review of every such decision." *Id.* (quoting *Bishop v. Wood*, 426 U.S. 341, 349–50 (1976) (rejecting due process claim where the plaintiff is fired from public employment for reasons either false or mistaken)).

The Ninth Circuit has not yet decided whether "substantive due process protects the right to a particular public employment position." *Id.* at 996-97. Until a specific substantive due process right is recognized or clearly established in this Circuit, officials are entitled to qualified immunity from such claims alleging a violation of such a right as a matter of law. *Lum v. Jensen*, 876 F.2d 1385, 1387-89 (9th Cir.1989). Accordingly, this claim must be dismissed.

Even if there is no claim to a particular job, a plaintiff can make out a substantive due process claim "if she is unable to pursue an occupation and this inability is caused by government actions that were arbitrary and lacking a rational basis." *Engquist,* 478 F.3d at 997. However, this claim is limited "to extreme cases," like "government blacklists" or "a legislative action that effectively banned a person from a profession." *Id.* When the government is the employer, "there is substantive due process protection against government employer actions that foreclose access to a particular profession to the same degree as government regulation." *Id.* at 998.

In determining whether a government employer's actions rise to the level of government regulation, "[i]t is not enough that the employer's stigmatizing conduct has some adverse effect on the employee's job prospects; instead, the employee must show that the stigmatizing actions make it virtually impossible for the employee to find new employment in his chosen field." *Id.* None of the plaintiffs have presented evidence that their employment options have been significantly reduced. The record reveals nothing that would indicate that any action taken by any of the individual defendants amounted to a government regulation, barring them from their career of choice.

Accordingly, the Court must grant the defendants' motion for summary judgment on the substantive due process claim based on denial of public employment as to each of the three plaintiffs.

## § 1983 – Gender

The Equal Protection clause of the Fourteenth Amendment confers a "federal constitutional right to be free from gender discrimination" at the hands of governmental actors. *Davis v. Passman,* 442 U.S. 228, 234-35 (1979). "This right is broad enough to prohibit state actors from engaging in intentional conduct designed to impede a person's career advancement because of her gender." *Lindsey v. Shalmy*, 29 F.3d 1382, 1385 (9th Cir. 1994).

The Circuit has held that "[e]vidence that is sufficient to create a genuine issue of material fact for purposes of" a Title VII claim "also serves to create a genuine issue for purposes of § 1983." *Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1113 (9th Cir. 1991). The Court has already identified numerous questions of fact regarding

the Title VII claims of Morehouse and Miller.  Those questions likewise preclude

summary judgment on their § 1983 claim based on gender.

With regard to plaintiff Wellock, to prove gender discrimination in violation of §

1983, a plaintiff must demonstrate that the defendants acted with the intent to

discriminate."  *Id.* at 1112.  Wellock must also be able to point to specific acts by the

individual defendants demonstrating intentional discrimination based on gender.  *Id.*

The Court finds questions of fact on these claims.  Wellock alleges that after she

made a legitimate complaint about sexual harassment, she was subjected to a campaign

by her supervisor Davidson to gin up inmate complaints about her having sex with

inmates and acting in sexually provocative ways.  She also claims to have been taunted

by other IDOC officials in sexually demeaning ways, forced out of her job, and not

rehired because she was a woman claiming sexual harassment.  This is enough to avoid

summary judgment on her § 1983 claim for gender discrimination.

## § 1983 – Bodily Integrity

The Due Process Clauses of the Fifth and Fourteenth Amendments protects the

right to "bodily integrity."  *Washington v. Glucksberg*, 521 U.S. 702, 720. (1997).

Morehouse has raised sufficient questions over whether Houdeshell's groping violated

her bodily integrity.  The other plaintiffs – Miller and Wellock – have made no claims

that they were touched in any manner.  Hence, this claim will be dismissed as to Miller

and Wellock, but not as to Morehouse.

## § 1983 –Reputation

The three plaintiffs have not pointed the Court to any evidence in the record supporting their claim that their constitutional right to their reputation was damaged in violation of § 1983.  The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted).   Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Accordingly this claim will be dismissed.

## § 1983 – First Amendment Rights

The plaintiffs argue that after they complained about sexual harassment, they were shunned and humiliated and subjected to false charges of sexual activity that led to adverse employment actions.  These actions, plaintiffs allege, were intended to deter them from pursuing their harassment claims.

In order to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that "by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct." *Mendocino Environmental Center v. Mendocino* County, 192 F.3d 1283 (9th Cir. 1999).   Even if plaintiffs are not actually chilled, it is still a First Amendment violation if "an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.*  An intent to inhibit speech can be demonstrated either through direct or circumstantial evidence.  *Id.*

For example, in *Hines v. Gomez,* 108 F.3d 265 (9th Cir.1997),  the Circuit held that circumstantial evidence that an inmate had a reputation for filing grievances and had told a guard that he planned to file a grievance, combined with the jury's rejection of the guard's purported reason for punishing the inmate, "warrants the jury's finding that [the guard] filed the disciplinary report in retaliation for [the prisoner's] use of the grievance system." *Id.* at 268.

The discussion above demonstrates that genuine issues of fact exist for each defendant over whether their claims of sexual harassment generated retaliatory actions by the defendants that would have deterred a person of ordinary firmness from pursuing the harassment charges.  This aspect of the motion for summary judgment will be denied.

## Qualified Immunity & Personal Liability

Qualified immunity shields a state official from personal liability (1) when the official reasonably believes that his or her conduct complies with the law, and (2) where clearly established law does not show that the official's conduct violated constitutional rights.  *See  Pearson v. Callahan*, 555 U.S. 223, 243–44 (2009).  The law governing the remaining claims was clear and, if the plaintiffs are to be believed, a reasonable official would know that his or her conduct would violate constitutional rights.  Accordingly, the Court rejects defendants' argument that the remaining claims should be dismissed on grounds of qualified immunity.

## Wellock's Motion for Summary Judgment

Plaintiff Wellock seeks summary judgment on her breach of contract claim. Wellock's breach of contract claim is that she had a contractual right under the IDOC

policies to be rehired off the rehire registry, and that IDOC breached that contract by hiring six individuals in her job category without once offering her a job.

She was placed on that rehire registry.  *See Exhibit O (Dkt. No. 70).* The IDOC Policy Manual states that "the appointing authority *must* hire from that register."  *See* § 05.01.05.04 (emphasis added).  That clear language was interpreted by IDOC to apply to Wellock in two instances.  On May 21, 2009, IDOC's Director of Human Resources, Judi Gregory, notified Wellock that once she was on the rehire list "the Department must re-employ you before filling the vacancy in your classification through other means." *See Exhibit M (Dkt. No. 69).*  Eight days later, on May 29, 2009, the State of Idaho's Human Resource Program Manager Michael Savole, notified Wellock that "the state agency which previously employed you must re-employ you before filling a vacancy in your class through other means."  *Id.*

The State's Administrator of the Division of Human Resources, Vicki Tokita, testified in her deposition that a person on the rehire registry did not need to go through the application process but was to be interviewed and offered the jobs coming up in her classification.  *See Tokita Deposition (Dkt. No. 68-2) at 41.*  Over the next year, Wellock applied for six different vacant Food Service Officer positions, but was not given a single offer.  *See Dolan Deposition (Dkt. No. 85) at pp. 59-60.*  The six people hired by IDOC were not on the rehire list.  *Id.*  While IDOC alleges that none of these jobs were in cities where Wellock wanted to work, she claims that there was no such requirement to be rehired.

IDOC seeks summary judgment first on the basis of its argument resolved earlier that its Policy Manual cannot create any contract rights in an employee as a matter of law.  The Court rejected that argument.

IDOC argues that the Eleventh Amendment bars the claim.  Wellock is only seeking the equitable relief of reinstatement and that claim in not barred as discussed earlier.

IDOC argues that the language of the Policy Manual does not create a contract. The Court disagrees.  The language quite clearly requires IDOC to hire Wellock from that registry, and two Human Resource professionals – one with IDOC and the other with the State of Idaho – so interpreted the Policy language.

IDOC argues that Wellock indicated that she only wanted to work in north Idaho and that none of the jobs that came open were in north Idaho.  But the registry notice that contains Wellock's listing says nothing about any preference for any region of Idaho. The Policy Manual does not condition offering a job on it being in a certain region preselected by the person.  There is no evidence that Wellock conditioned her rehire – and her placement on the rehire registry – on the job being in a certain region of Idaho. The Court rejects this argument.

The Court will grant Wellock's motion for summary judgment in part.  The Policy Manual clearly creates a contract right to be rehired once she was on the rehire registry for jobs in her classification.  The Court rejects the arguments of IDOC set forth above. There is clearly a contract and a breach of that contract by IDOC when it failed to even offer Wellock the six jobs that came open in her classification during the year she was on

the rehire registry.  The Court will not, however, grant summary judgment as to the remedy.  That matter was not fully discussed in the briefing and remains to be tried.[4]

## ORDER

In accordance with the Memorandum Decision above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for summary judgment filed by defendants (docket no. 57) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks dismissal of (1) the claims of Morehouse, Miller and Wellock for denial of employment under § 1983; (2) the claims of Wellock and Miller for violation of their right to bodily integrity under § 1983; and (3) the claims of Morehouse, Miller and Wellock for violation of their rights to reputation under § 1983. The motion will be denied in all other respects.

IT IS FURTHER ORDERED, that the motion for summary judgment filed by plaintiff Wellock (docket no. 66) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks a ruling that Wellock had a contractual right to be offered a job during her year on the rehire registry and that IDOC breached that contractual right by failing to offer her any of the six jobs that came open in her classification during that time.  It is denied in all other respects.

IT IS FURTHER ORDERED, that the motions to strike (docket nos. 77, 88 & 101) are DENIED.

---

[4]  The defendants filed three motions to strike.  The only challenged material that was relied upon by the Court is cited specifically in the opinion above.   That is just a small amount of the material challenged. The Court will deny the motions because either the Court did not rely on the material challenged, or, with regard to the material actually cited by the Court, the Court finds no reason to strike the material.



DATED: October 28, 2013

B. Lynn Winmill
Chief Judge
United States District Court